## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

TAMMY HOLLAND,

     Plaintiff,

v.

WAYNE W. WILLIAMS, in his official capacity as
Colorado Secretary of State,

     Defendant.

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

### INTRODUCTION

1.     This civil-rights lawsuit challenges Colorado's system of private campaign-finance enforcement. Plaintiff Tammy Holland is a Colorado resident, a parent to a middle-school-aged son, and a critic of some of the policies of her local school board related to Common Core curricula and testing. To express her criticism and to educate the public about these issues, Ms. Holland took out a series of ads in her local newspaper. For doing so, she found herself sued—not once, but twice—by school officials who disliked her ads and accused her of violating Colorado's campaign-finance laws.

2.     Unlike most states—in which campaign-finance laws are enforced directly by the Secretary of State or another government agency—Colorado has outsourced enforcement of its campaign-finance laws to the public at large. Under Colorado law, "any person" may initiate a lawsuit to enforce Colorado's campaign-finance laws by filing a complaint with the Secretary of State. The Secretary of State *must* forward these complaints to the Office of Administrative

Courts, triggering full-blown litigation in which the complainant is entitled to use all the tools of discovery in furtherance of even the most baseless and abusive complaints.

3.     The result of Colorado's private-enforcement system is that Coloradans who exercise their First Amendment rights are exposed to arbitrary, viewpoint-based retaliation and costly litigation with no accountability and no effective check by the Colorado executive branch. This lawsuit seeks to declare that system unconstitutional under the First Amendments to the U.S. Constitution, as incorporated against the States by the Fourteenth Amendment, so that Tammy Holland and others like her may speak openly about the issues that matter to them, free from the fear that they may be sued by their political opponents in an effort to silence them.

## JURISDICTION

4.     Plaintiff brings this civil-rights lawsuit pursuant to the First and Fourteenth Amendments to the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. § 2201. Plaintiffs seek injunctive and declaratory relief against Article XXVIII, Section 9(2) of the Colorado Constitution; Colorado Revised Statutes § 1-45-111.5(1.5)(a); and any associated rules or practices of the Secretary of State.

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

## VENUE

6.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(b)(1)–(2).

## PARTIES

7.     Plaintiff Tammy Holland is a resident of Strasburg, Colorado.

8.     Defendant Wayne W. Williams is the Colorado Secretary of State under Article IV, Section 1(1) of the Colorado Constitution. The Secretary is responsible for administering the

Fair Campaign Practices Act and Article XXVIII of the Colorado Constitution pursuant to Section 9 of Article XXVIII. At all times relevant to this complaint, the Secretary was acting under color of state law. Plaintiff is suing the Secretary in his official capacity and seeks only prospective declaratory and injunctive relief against him.

## STATEMENT OF FACTS

### Tammy Holland and Her Ads

9.      Tammy Holland is a resident of Strasburg, Colorado, where she lives with her husband and sixth-grade son.

10.      In recent years, Ms. Holland has become extremely concerned about the state of public education in America. Ms. Holland is particularly troubled by the spread of so-called Common Core curricula and the growing use of standardized testing, which she believes stifles intellectual curiosity and subjects children to needless stress.

11.      Ms. Holland was particularly concerned when she saw that Byers School District, where her son was a student, had adopted these practices.

12.      Ms. Holland repeatedly tried to exempt her son from the standardized-testing program in Byers School District.

13.      Ms. Holland ultimately withdrew her son from Byers School District; he now attends a private school that requires a considerable commute each day.

14.      Even though Ms. Holland has removed her son from Byers School District, she remains committed to fixing the standardized-testing regime now in place in Colorado. Moreover, if Byers School District were to implement standards other than Common Core, she would gladly re-enroll her son there.

15.     To that end, Ms. Holland has a long history of placing ads in the local newspaper—*The I-70 Scout*, published every Tuesday—in which she critiques Common Core and standardized-testing programs.

16.     Between January 2015 and September 2015, Ms. Holland placed around fourteen of these ads in *The I-70 Scout*. True and correct copies of a sample of these ads are attached as Exhibit 1.

17.     Ms. Holland's most recent submissions ran in September 2015. These ads concerned the then-upcoming school-board election, in which four seats on the Byers school board were up for election. Only two of the four incumbents were seeking reelection, and six non-incumbents were also campaigning. In Ms. Holland's view, many locals were unaware of all the candidates running for office. So, to inform the electorate, she paid for two ads in *The I-70 Scout.* True and correct copies of these two ads are attached as Exhibit 2 to this Complaint.

18.     On their face, neither of Ms. Holland's September ads expressly advocated for or against any particular candidate. The ads did not contain the words "vote for," "vote against," "support," or "oppose"—or any similar terms—in reference to any candidate. Nor did Ms. Holland intend for the ads to urge a particular electoral outcome. Rather, the ads were intended to—and did—invite readers to educate themselves about the full slate of eight candidates, and they stressed the importance of "careful consideration of each candidate's objectives." Ex. 2.

19.     For exercising her First Amendment rights in this way, Ms. Holland found herself sued—twice—by local school officials, alleging campaign-finance violations and triggering Colorado's private-enforcement process under Section 9(2)(a) of the Colorado Constitution.

### Colorado's Campaign-Finance Laws

20.     As the Secretary's office recently acknowledged, Colorado's campaign-finance code is "not an easy or readily apparent area of law." Colo. Sec'y of State, *Proposed Legislation 2016*, at 2 (attached as Exhibit 3).

21.     Colorado's campaign-finance laws are memorialized in Article XXVIII of the state Constitution; in the Fair Campaign Practices Act, Colo. Rev. Stat. Ann. §§ 1-45-101 to -118 (West 2011); in 27 pages of regulations promulgated by the Secretary, 8 Colo. Code Regs. 1505-6; in fifteen years' worth of advisory opinions; in judicial decisions dating back more than a decade; in hundreds of administrative-court rulings; and lastly, in a non-binding, 140-page *Campaign and Political Finance Manual*.

22.     To enforce this body of law, Colorado empowers "any person" to file a complaint alleging that someone has violated the campaign-finance code. The sole requirements for such complaints is that they be in writing, signed, and filed with the Secretary of State no later than 180 days after the date of the alleged violation. Colo. Const. art. XXVIII, § 9(2)(a); *see also* Colo. Rev. Stat. § 1-45-111.5(1.5)(a) ("Any person who believes that a violation of either the secretary of state's rules concerning campaign and political finance or this article has occurred may file a written complaint with the secretary of state not later than one hundred eighty days after the date of the occurrence of the alleged violation."); 8 Colo Code Regs. 1505-6:18.4.1.

23.     While the Secretary's regulations require that a complainant identify "[t]he particulars of the violation," 8 Colo Code Regs. 1505-6:18.4.1(c), the Secretary's guidance elaborates that complainants should identify "the alleged violation(s)" and the "specific laws alleged to be violated" only "where known." Colo. Sec'y of State, *How to File a Complaint*, http://cosos.learnercommunity.com/portal/Files/Org/5d253e1535be429bb1f78929a435c5c6/site/asset

s/campaign_finance/complaints/filing_a_complaint_how_to_file_a_complaint.html (last visited

Jan. 15, 2016).

24.     The Secretary's office does not investigate or prosecute these complaints. Nor

does it even inquire whether the complaints have legal merit or factual support.

25.     Instead, it is "the citizen complaint process" that "adjudicates alleged violations."

Colo. Sec'y of State, *Campaign and Political Finance Manual* 34 (rev. July 2015),

https://www.sos.state.co.us/pubs/elections/CampaignFinance/files/CPFManual.pdf. This process

"is carefully designed to keep the Secretary of State out of the litigation process." *Colo. Ethics*

*Watch v. Clear the Bench Colo.*, Case No. OS 2010-0009, at 11 (Colo. Office of Admin. Cts.

Sept. 22, 2010) (final agency decision), *aff'd Colo. Ethics Watch v. Clear the Bench Colo.*, 277

P.3d 931 (Colo. App. 2012). Thus, "[n]othing . . . gives the Secretary any ability to control or

oversee the conduct of the litigation." *Id.* at 12.

26.     After receiving a private complaint, the Secretary "shall" refer it to the Office of

Administrative Courts within three days. Colo. Const. art. XXVIII, § 9(2)(a).

27.     This referral triggers full-blown enforcement litigation before the Office of

Administrative Courts.

28.     Because the complaint process is civil in nature, those accused of violating the

campaign-finance laws have no right to an attorney. If they wish to be represented by counsel,

they must do so at their own expense.

29.     The administrative proceeding authorized by Section 9(2)(a) allows, to the extent

practicable, both parties to conduct full discovery, including depositions and demands for

documents.

30.     The Secretary even advises private complainants that they should proceed "as if they were prosecuting a case." Colo. Sec'y of State, *Campaign and Political Finance Manual* 34.

31.     In fact—apart from the private status of the "prosecutors"—the main difference between these proceedings and typical government-enforcement litigation is that the respondent in a private campaign-finance suit cannot expect service of process. It is enough for the Secretary to mail the complaint to whatever address the agency may have on file. Colo. Const. art. XXVIII, § 9(1)(f); Colo. Rev. Stat. § 24-4-105(2)(a).

32.     Within fifteen days of the Secretary's referring the complaint to the Office of Administrative Courts, an administrative law judge "shall" hold a full hearing, though respondents can request a 30-day extension. Colo. Const. art. XXVIII, § 9(2)(a).

33.     If the administrative law judge determines that a violation has occurred, the judge's decision "shall include any appropriate order, sanction, or relief authorized by" Article XXVIII of the Colorado Constitution. *Id.*

34.     At the same time, administrative law judges lack jurisdiction to rule on facial constitutional challenges to statutes; they can determine only whether the laws may be constitutionally applied to the particular respondents in an administrative action. Thus, a respondent who has been charged under a facially unconstitutional law may not have that defense heard unless an appeal is taken from the administrative law judge's decision.

35.     An aggrieved party may appeal from the Office of Administrative Courts to the Colorado Court of Appeals and from there may petition the Colorado Supreme Court for review. *See id.*

36.     These appeals can last for years.

## The First Complaint Against Tammy Holland

37.     Days after Tammy Holland placed her ads, in September 2015, Tom Turrell—the Superintendent of Byers School District—filed a private campaign-finance complaint against her. He sued both on his own behalf and on behalf of the school district as an entity. A true and correct copy of this complaint is attached as Exhibit 4.

38.     In accordance with the Colorado Constitution, Article XXVIII, Section 9(2)(a), the Secretary of State promptly referred Superintendent Turrell's complaint to the Office of Administrative Courts.

39.     Superintendent Turrell's complaint alleged that Ms. Holland violated campaign-finance laws in two ways. First, he claimed, Ms. Holland should have registered a "political committee" under Colorado law. Second, he asserted that she should have included a "paid for by" disclaimer on her ads, under federal campaign-finance law. *See* Ex. 4 at 3–4.

40.     Superintendent Turrell's claim was legally meritless.

41.     Ms. Holland's ads could not have triggered Colorado's political-committee laws because they did not include words of "express advocacy." *See Colo. Ethics Watch v. Senate Majority Fund, LLC*, 269 P.3d 1248, 1251 ¶ 5 (Colo. 2012).

42.     Ms. Holland's ads also could not have triggered federal disclaimer requirements, which apply only to federal elections, *see* 52 U.S.C. § 30101(2), or state disclaimer requirements, which, like Colorado's political-committee laws, apply only to ads containing "express advocacy." *See Campaign Integrity Watchdog v. Protect and Defend Colo.*, Case No. OS 2014-0040, at 7 (May 21, 2015) (final agency decision) (holding that no disclaimer was required where "the communications at issue . . . did not contain express advocacy and therefore do not qualify as independent expenditures").

43.     Although Superintendent Turrell's complaint was meritless, Ms. Holland had no way of knowing that. Ms. Holland has no experience with state or federal campaign-finance law, and, on receiving notice of Superintendent Turrell's complaint, she had no way to reliably evaluate whether his claims had merit. To protect herself and her family, she felt compelled to retain a private law firm to defend her.

44.     After receiving the complaint, the Office of Administrative Courts notified Ms. Holland that it had set a hearing on the case for October 8, 2015.

45.     Two days before the scheduled hearing, Superintendent Turrell voluntarily withdrew the complaint. He did not alert Ms. Holland to this development, and she did not receive notice of the dismissal until the evening of October 7, about twelve hours before she would have had to leave for the hearing in Denver.

46.     Given the dismissal's last-minute timing, Ms. Holland's attorneys spent a considerable amount of time preparing her defense, incurring more than $3,500 in fees.

47.     Two days after the court dismissed the complaint against her, Ms. Holland moved to recover those fees from Superintendent Turrell and Byers School District.

48.     Ms. Holland attended the monthly meeting of the Byers school board the following week, on October 15. At that meeting, school-board member Tom Thompson—who was running for reelection and had been named in Ms. Holland's ads—made clear that he had "instructed" Superintendent Turrell to file the complaint against Ms. Holland. Mr. Thompson also said that he was preparing to re-file the complaint against Ms. Holland in his own name. And, following a discussion about Ms. Holland's pending request for attorneys' fees, Mr. Thompson warned her that "I think you'd better keep your lawyer"—a statement another board member characterized as a "threat."

49.     The following morning, October 16, Superintendent Turrell left a message on Ms. Holland's answering machine. In that message, Superintendent Turrell confirmed that Tom Thompson and another school-board member were preparing to file a second campaign-finance complaint against her, but, he advised, "if you would consider dropping the countersuit for fees and expenses, that they would consider it being all done."

### The Second Complaint Against Tammy Holland

50.     Ms. Holland did not respond to the October 16 voicemail asking her to drop her request for attorneys' fees. True to his word, Tom Thompson re-submitted the original complaint two days later. A true and correct copy of that complaint is attached as Exhibit 5.

51.     In a statement to *The I-70 Scout*, Mr. Thompson made clear that he filed this complaint in response to what he perceived to be the message expressed in Ms. Holland's ads. "If I got to choose what would happen," he said, "I'd ask for an ad in the paper apologizing for what [Holland] said." "I don't want anything out of it except that," he emphasized. Kathy Smiley, *Byers School, Parent Dispute Alleged Violation of Political Ad Law*, The I-70 Scout, Oct. 29, 2015, *available at* http://i-70scout.com/blog/2015/10/byers-school-parent-dispute-alleged-violation-of-political-ad-law/ (last accessed Jan. 15, 2016).

52.     The content of Mr. Thompson's complaint was identical to that of Superintendent Turrell's earlier complaint.

53.     Like its predecessor complaint, Mr. Thompson's complaint alleged that Ms. Holland (1) violated Colorado campaign-finance law by failing to register a political committee and (2) violated *federal* campaign-finance law by failing to include a "paid for by" disclaimer on her ads.

54.     Like its predecessor complaint, Mr. Thompson's complaint was legally meritless.

55. Even so, the Secretary of State's Office forwarded Mr. Thompson's complaint to the Office of Administrative Courts, as the Colorado Constitution requires.

56. Following a scheduling conference—which Mr. Thompson did not attend—the Office of Administrative Courts set a hearing date of January 21, 2016.

**Colorado's History of Politically Motivated Private-Enforcement Actions**

57. Tammy Holland's experience with the Colorado enforcement system is hardly unique.

58. Because Colorado entrusts enforcement of its campaign-finance laws to "any person," enforcement actions are often prosecuted by complainants—like the Byers school officials—who simply do not like what their targets are saying.

59. Given Colorado's private-enforcement law, every person who speaks about topics of public note in Colorado runs the risk that their political or ideological opponents will allege campaign-finance violations and drag them into court.

60. In other words, Colorado has outsourced to "any person" the power to enforce a body of law that applies *only* in the charged atmosphere of political campaigns.

61. This enforcement system is uniquely prone to speech-retaliatory abuse. By outsourcing campaign-finance enforcement, Colorado invites—even depends on—retaliatory suits between political opponents.

62. The Secretary of State himself has acknowledged that "[t]he current scheme allows frivolous and litigious complainants to potentially violate the free speech and due process rights of those seeking to lawfully participate in political discourse." Ex. 3 at 4.

63.     In a recent report on proposed legislation, the Secretary voiced concern that the existing system invites "overly aggressive and politically motivated" enforcement actions. Ex. 3 at 2.

64.     The Secretary recognized that some private complainants "have abused the campaign finance complaint process to attack small and unsophisticated individuals and committees for making minor, often times clerical, errors in their disclosure reports." Exhibit 3 at 2.

65.     Other "litigious individuals," the Secretary observed, use the private-enforcement scheme as a more sophisticated tool, "frivolously fil[ing] complaints in an attempt to bankrupt— and therefore close—committees they don't like or agree with it [sic]." The Secretary's report references "several dozen" examples of what it characterized as these "disingenuous complaints." Ex. 3 at 2.

**Other Consequences of Colorado's Private-Enforcement System**

66.     Beyond inviting retaliatory enforcement actions, Colorado's private-enforcement scheme also breeds uncertainty and confusion about the precise scope of the state's campaign-finance laws, for two related reasons.

67.     First, because Colorado has divorced administration from enforcement, people and groups who wish to speak in Colorado cannot confidently rely on guidance from the Secretary of State's Office.

68.     Even if a speaker follows the Secretary's instructions to the letter, complainants can still sue under Colorado's private-enforcement law—and they may even win.

69.     In one case, for example, a group registered itself as an "issue committee" under the Secretary's explicit direction, only to be subjected to nearly two years of litigation when a

private complainant claimed that they should have registered as a "political committee" instead. Ultimately, both the Office of Administrative Courts and the Colorado Court of Appeals decided that the Secretary's instructions were incorrect. *Colo. Ethics Watch v. Clear the Bench Colo.*, Case No. OS 2010-0009 (Colo. Office of Admin. Cts. Sept. 22, 2010) (final agency decision), *aff'd Colo. Ethics Watch v. Clear the Bench Colo.*, 277 P.3d 931 (Colo. App. 2012). To have prevailed against this lawsuit, in other words, the respondent would have needed to deliberately disregard the Secretary of State's advice.

70.     In 2014, in another example, a candidate reportedly followed the Secretary's advice and disclosed the occupation and employer of four contributors as "unknown." A complainant sued, claiming that the occupations and employers should, in fact, have been listed. Even though the respondent maintained that he had followed the Secretary's instructions, the court ruled for the complainant. The respondent was fined $1,080 and ordered to return the four contributions. *See Campaign Integrity Watchdog v. Dan Thurlow/55*, Case Nos. OS 2015-0009 & OS 2015-0010 (Colo. Office of Admin. Cts. June 17, 2015) (decision).

71.     Again, in 2006, a candidate followed "the advice given by [a] Secretary of State employee" about how to return an excess contribution. A serial complainant sued the candidate, triggering nearly three months of litigation, appearances by lawyers on both sides, and a full administrative hearing. At the end of it all, the court ruled that neither the candidate nor his donors had violated any law. *See Bucknam v. Mitchell*, Case No. OS 2006-0009 (Colo. Office of Admin. Cts. July 14, 2006) (agency decision).

72.     As a final example, a complainant sued a group in 2014 for omitting certain information on one of its filed reports. The organization insisted that it had filled out the report correctly but that a system error in Colorado's disclosure website erased the missing data. After

nearly three months of litigation, the court found it more likely than not that the government website had simply malfunctioned. *See Campaign Integrity Watchdog v. Mainstream Colo.*, Case No. OS 2014-0031 (Colo. Office of Admin. Cts. Jan. 20, 2015) (final agency decision).

73.     The second source of confusion also follows from the gap between the Secretary, who administers the campaign-finance laws, and the population at large, which enforce it. Because the Secretary has no authority to decide which campaign-finance cases are prosecuted, private complainants have enormous power to distort Colorado's campaign-finance laws through case-by-case adjudication.

74.     Because no publicly accountable government officer oversees the prosecution of these campaign-finance cases, the end result is that, in the Secretary's words, there have been "several instances of ALJs creating and then consistently reapplying bad law." Ex. 3, at 3.

75.     In at least one recent case, in fact, the Secretary of State intervened in an enforcement proceeding on the side of the *respondent*. A ruling in the complainant's favor, the government argued, would "impair the Secretary's ability to ensure that the public and candidates are provided with complete and accurate guidance." Sec'y Mot. to Intervene at 3, *Campaign Integrity Watchdog v. All. for a Safe and Indep. Woodmen Hills Political Comm.*, OS 2015-0014 (Office of Admin. Cts., filed Oct. 16, 2015).

76.     This is a systemic problem. As the Secretary's campaign-finance deputy has remarked, "If you [i.e., the government] don't get in on a case and you don't intervene, then you don't have a right of appeal, and if the parties end up walking away you have case law affecting everyone in the state that we may not agree with." Megan Schrader, *Colorado Secretary of State intervenes in campaign finance fight*, The Gazette, Nov. 17, 2015, *available at*

http://gazette.com/colorado-secretary-of-state-intervenes-in-campaign-finance-fight/article/1563606.

## **Injury to Tammy Holland**

77.     Until September 2015, Ms. Holland was engaged in a debate about an important local issue—the content of public-school education in Byers School District. As the mother of a child who, until recently, attended Byers School District, this issue affects her deeply.

78.     Ms. Holland would like to engage in similar discourse in the future.

79.     To engage in such debates fully and effectively, Ms. Holland must be able to communicate information and opinions and to attempt to win converts to her positions.

80.     Colorado's system of private campaign-finance enforcement substantially burdens and chills Ms. Holland's and others' rights to free speech and association under the First and Fourteenth Amendments to the United States Constitution.

81.     By allowing "any person" to bring an action to enforce the campaign-finance laws, Article XXVIII, Section 9(2)(a) of the Colorado Constitution places Ms. Holland (and anyone else who wishes to speak out about arguably political issues) under the constant threat of having to defend against retaliatory lawsuits brought by ideological adversaries.

82.     Defending against such lawsuits can be expensive, time consuming, and taxing. These suits can also expose respondents to intrusive and onerous discovery requests, which can require respondents to produce the contents of private e-mails and conversations concerning their opinions on sensitive or controversial political and social issues.

83.     In short, the threat of being hauled into court under Colorado's private-enforcement law is enough to chill or silence a person of ordinary firmness from speaking out on topics of public note.

84.     Ms. Holland is no exception. Defending against two meritless administrative complaints has cost Ms. Holland time and money. In fact, to protect herself against the threat of sanctions, she was compelled to hire private lawyers at considerable personal cost.

85.     Ms. Holland would like to continue running ads in her local newspaper about issues related to local education. But as long as Colorado's system of private campaign-finance enforcement remains in place, Ms. Holland has been chilled from placing further ads, because doing so risks another private lawsuit by a school official or, indeed, "any person" who happens to dislike her views.

## CONSTITUTIONAL VIOLATIONS

### Claim for Relief

### (First Amendment—Private Enforcement)

86.     Plaintiff realleges and incorporates by reference all of the allegations set forth in ¶¶ 1 through 85 above.

87.     Article XXVIII, Section 9(2)(a) of the Colorado Constitution and Colorado Revised Statutes § 1-45-111.5(1.5)(a) empower "any person" to file and prosecute a complaint for alleged violations of the registration, reporting, and disclosure provisions of Colorado's campaign-finance laws.

88.     These enforcement actions visit severe burdens on respondents, in the form of legal fees, potential civil liability, reputational harm, and exposure to intrusive discovery.

89.     Private complainants suing under Section 9(2)(a) and Colorado Revised Statutes § 1-45-111.5(1.5)(a) are bound by none of the ethical obligations or constitutional duties that constrain government agencies in their exercise of enforcement discretion.

90.     Rather, Section 9(2)(a) and Colorado Revised Statutes § 1-45-111.5(1.5)(a) invite private complainants to pursue enforcement actions to intimidate and harass their political opponents or to retaliate against speakers whose messages they dislike.

91.     Under the current private-enforcement system, therefore, every person who speaks about a topic of public note in Colorado runs the risk that their political or ideological opponents will allege campaign-finance violations and subject them to a lengthy, costly, and retaliatory enforcement action.

92.     Under Section 9(2)(a) and Colorado Revised Statutes § 1-45-111.5(1.5)(a), the Secretary of State must refer all private-party complaints—including even frivolous or legally insufficient complaints—to the Office of Administrative Courts within three days of receiving the complaint. This state action commences the enforcement proceeding in the Office of Administrative Courts.

93.     Section 9(2)(a) and Colorado Revised Statutes § 1-45-111.5(1.5)(a) deprive Ms. Holland and others similarly situated of their rights to free speech and association under the First and Fourteenth Amendments to the United States Constitution by subjecting them to the constant threat that they will be exposed to burdensome and retaliatory private-enforcement actions as the cost of engaging in public discourse.

94.     As a direct and proximate result of Section 9(2)(a) and Colorado Revised Statutes § 1-45-111.5(1.5)(a), Ms. Holland and others similarly situated have suffered and will suffer irreparable harm to their constitutional rights. Ms. Holland has no adequate legal, administrative, or other remedy by which to prevent or minimize this harm. Unless the Defendant Secretary of State is enjoined from implementing and administering Section 9(2)(a) and Colorado Revised

Statutes § 1-45-111.5(1.5)(a), Ms. Holland and others similarly situated will continue to suffer great and irreparable harm.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests relief as follows:

1.      For entry of judgment declaring that the private-enforcement provisions of Section 9(2) of Article XXVIII of the Colorado Constitution and Colorado Revised Statutes § 1-45-111.5(1.5)(a) are facially unconstitutional;

2.      For entry of a permanent injunction against the Defendant prohibiting him from administering Section 9(2) of Article XXVIII of the Colorado Constitution and Colorado Revised Statutes § 1-45-111.5(1.5)(a);

3.      For an award of attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988; and

4.      For such further legal and equitable relief as the Court may deem just and proper.

Dated: January 20, 2016

Respectfully submitted,

/s/ Paul M. Sherman
Paul M. Sherman
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Tel:  (703) 682-9320
Fax:  (703) 682-9321
E-mail: psherman@ij.org

/s/ Samuel B. Gedge
Samuel B. Gedge
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Tel:  (703) 682-9320
Fax:  (703) 682-9321

E-mail: sgedge@ij.org

Clifford L. Beem, # 917
A. Mark Isley, # 26107
Danielle C. Beem, # 45189
BEEM & ISLEY, P.C.
730 17th Street, #850
Denver, CO 80202
Tel: (303) 894-8100
Fax: (303) 894-8200
E-mail: clbeem@beemlaw.net
      amisley@beemlaw.net
      dcbeem@beemlaw.net

*Attorneys for Plaintiff*