**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Raymond P. Moore**

Case No. 16-cv-00138-RM-MLC

TAMMY HOLLAND,

     Plaintiff,

v.

WAYNE W. WILLIAMS, *in his official capacity as Colorado Secretary of State*,

     Defendant.

---

## OPINION AND ORDER

---

On January 20, 2016, plaintiff Tammy Holland ("plaintiff") filed a Complaint against defendant Wayne W. Williams in his capacity as the Colorado Secretary of State ("defendant"), alleging Article XXVIII, § 9(2)(a) of the Colorado Constitution ("Section 9(2)(a)") and Colo. Rev. Stat. § 1-45-111.5(1.5)(a) ("Section 1.5(a)") are facially unconstitutional under the First and Fourteenth Amendments of the U.S. Constitution. (ECF No. 1.)

Among other things, pending before the Court is plaintiff's motion for summary judgment ("the motion for summary judgment") (ECF Nos. 129, 131) and statement of undisputed material facts (ECF Nos. 129-1, 131-1). Defendant has filed a response in opposition to the motion for summary judgment (ECF No. 145), and a response in opposition to plaintiff's statement of undisputed material facts (ECF Nos. 145-1, 147). Plaintiff filed a reply (ECF Nos. 152, 154), and a reply statement of undisputed material facts (ECF Nos. 152-1, 154-1).

## I.    Legal Standard for Summary Judgment

Summary judgment is appropriate "when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  Initially, the movant bears the "responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986).  If this burden is met, then the non-moving party must set forth specific facts showing that there is a genuine dispute for trial. *Id*. at 324.  A fact is material if it has the potential to affect the outcome of a dispute under applicable law. *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995).  An issue is genuine if a rational trier of fact could find for the non-moving party. *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

In performing this analysis, the factual record and any reasonable inferences therefrom are construed in the light most favorable to the non-moving party. *Id*.  However, a mere "scintilla of evidence" is insufficient to avoid summary judgment. *Turner v. Public Service Co. of Colorado*, 563 F.3d 1136, 1142 (10th Cir. 2009).  Instead, a non-movant "must proffer facts such that a reasonable jury could find in her favor." *Id*.

## II.    Discussion[1]

### A.    The Relevant First Amendment Test

Before addressing the merits of plaintiff's constitutional challenges to Section 9(2)(a) and Section 1.5(a) (collectively, "the enforcement provisions"), the Court must determine by which test they must be judged.  As will be seen, in the context of the First Amendment and the speech at issue

---

[1] The pertinent undisputed facts are set forth in the Court's discussion.

here, this is easier said than done. The parties propose their own tests, so the Court will address them first.

First, defendant. Defendant proposes that the Court apply a test requiring that, in every application, the enforcement provisions create an impermissible risk of suppression of ideas, citing *Colo. Right to Life Comm., Inc. v. Coffman*, 498 F.3d 1137 (10th Cir. 2007) ("*CRLC*"). (ECF No. 145 at 4-5.) Unfortunately for defendant, as will be seen later, it made a critical mis-step in relying upon *CRLC*. For now, it is enough to say that *CRLC* does not provide the relevant test for this case. Defendant should have realized this, given that it cites to another case that illustrates why the "in every application" test is more a figment of the imagination, rather than a test for facial constitutional challenges.

That case is *Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012). Defendant cites this case for the proposition that, when it comes to facial challenges, a court must compare statutory text to the relevant constitutional test in order to determine whether a statute is constitutional. (ECF No. 145 at 5.) With that, the Court can agree. The problem is that defendant then asserts that the relevant constitutional test is the "in every application" test set forth above. (*See id*.) A cursory reading of *Doe* would have shown defendant that, that is not the relevant test. Instead, reading *Doe* would have shown defendant that the "in every application" test is not a test at all. As the Tenth Circuit Court of Appeals clearly explained, the "in every application" principle "is correctly understood not as a separate test applicable to facial challenges, but a description of the outcome of a facial challenge in which a statute fails to satisfy the appropriate constitutional framework." *Doe*, 667 F.3d at 1123. The Tenth Circuit, relying on language from the Supreme Court, further explained that the distinction between a facial and an as-applied challenge "'goes to the breadth of the remedy

employed by the Court, not what must be pleaded in a complaint.'" *Id*. at 1124 (quoting *Citizens United v. FEC*, 558 U.S. 310, 331, 130 S.Ct. 876 (2010)). In other words, to call the "in every application" principle a test is "simply a fiction, readily dispelled by a plethora of Supreme Court authority." *Id*. Then, just to make sure that the reader could not be mistaken, the Tenth Circuit did not apply the "in every application" principle as the test to the facial challenge in *Doe*; instead, it applied "the applicable constitutional framework—in this case, forum analysis." *Id*. at 1127-28.

To the extent *CRLC* suggests a different approach to facial challenges, this Court chooses to follow the more recent guidance from the Tenth Circuit in *Doe* as to how to approach the same. As a result, the Court rejects defendant's proposal for the applicable test here.

As *Doe* explains, though, a court must still determine the applicable constitutional test with respect to the law at issue. *Id*. at 1123. This Court continues on that quest by considering plaintiff's proposed test. Plaintiff first proposes that the enforcement provisions are unconstitutional because they place "unchecked power" in private citizens to enforce Colorado's campaign finance laws, which, plaintiff argues, raises constitutional concerns of the highest order and is "virtually per se invalid." (ECF No. 131 at 14-16, 22-23.)[2] To the extent this "categorical" test is, in fact, a test with support in case law, it is not the applicable test here.

A cursory review of plaintiff's argument in this regard reflects that plaintiff has borrowed this purported test from a line of cases involving laws that delegate "overly broad discretion" to a person charged with making decisions for granting or denying licenses or permits. (*See* ECF No. 131 at 14-15 (citing *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133 n.10, 112 S.Ct. 2395

---

[2] Unless otherwise noted, the Court uses the page numbers assigned by the CM/ECF system in the top-right hand corner of the applicable pleading.

(1992))). The fundamental problem with plaintiff doing so is that, in her reply, plaintiff completely, and very clearly, disavows any dependency on an overbreadth challenge. (*See* ECF No. 154 at 10 n. 2 ("[Defendant] also draws heavily on precedent involving the First Amendment overbreadth doctrine, but as in *Doe*, this lawsuit is not properly characterized as an overbreadth challenge.") (citations and quotation omitted)). In other words, the motion for summary judgment and plaintiff's reply were either written by two entirely different beings or plaintiff is attempting to cherry-pick favorable sounding bites from cases, while also distancing herself from the less palatable portions of those cases. At best, plaintiff is a pot calling the kettle black, given that plaintiff also draws heavily on the overbreadth doctrine.

In any event, irrespective of plaintiff's disavowal of the overbreadth doctrine, it would not be the appropriate test here. In a nutshell, plaintiff's argument is that the enforcement provisions grant too much discretion in the person bringing an enforcement action to choose the reason why he or she is bringing the action. (ECF No. 131 at 14-15.) According to plaintiff, a person could bring an enforcement action to target speech that the enforcer dislikes due to the discretion vested in the enforcement provisions. (*Id*.) The problem is that the Supreme Court has strongly indicated, if not actually held, that challenges to laws placing unconstrained authority in a decisionmaker are generally limited to licensing schemes. *See Ward v. Rock Against Racism*, 491 U.S. 781, 793, 109 S.Ct. 2746 (1989) ("As a threshold matter, it is far from clear that respondent should be permitted to bring a facial challenge to this aspect of the regulation. Our cases permitting facial challenges to regulations that allegedly grant officials unconstrained authority to regulate speech have generally involved licensing schemes that vest unbridled discretion in a government official over whether to permit or deny expressive activity.") (quotation omitted).

5

As in *Ward*, the grant of discretion that plaintiff seeks to challenge "is of an entirely different, and lesser, order of magnitude, because respondent does not suggest that city officials enjoy unfettered discretion to deny [speech] altogether." *Id.* at 794. Here, the clear text of the enforcement provisions reflects that any person who decides to enforce Colorado's campaign finance laws can only do so if he or she believes that a violation of those laws has occurred. It is plainly impossible for a person to have such a belief *before* someone has actually purportedly committed a violation, i.e., before someone has actually spoken. Moreover, the enforcement provisions are in no sense a licensing or permit scheme. Thus, even if the Court were willing to accept plaintiff's assertion that her speech has been chilled, a person bringing an enforcement action under the enforcement provisions does not have unfettered discretion to *deny* speech altogether. Therefore, this case (and the test plaintiff proposes) does not fall into the "narrow class of permissible facial challenges" concerning unconstrained discretion. *See id.*[3]

Fortunately for plaintiff, she does not place all of her eggs in one basket, as she also argues that the enforcement provisions fail under any level of scrutiny. (*See* ECF No. 131 at 23-24.) Plaintiff, though, spends limited time, if any, explaining what the applicable levels of scrutiny are in this case, other than regurgitating the meaning of strict scrutiny. (*See id.*) There could be a good reason for this because, as mentioned, determining the applicable test is not straightforward. That being said, in light of the Court rejecting the parties' principal proposals, the Court must do the heavy lifting on its own.

_____

[3] The Eleventh Circuit Court of Appeals' decision in *Bell v. City of Winter Park, Fla.*, 745 F.3d 1318 (11th Cir. 2014), does not persuade the Court to find otherwise. Notably, that decision also relies upon cases similar to the ones plaintiff relies upon, in that they involve unrestrained discretion in granting or denying permits or licenses. *See id.* at 1324. As explained, that line of cases is not applicable here, and thus, the Court does not find *Bell* to be helpful in deciding this case.

Alas, the Tenth Circuit has again provided substantial illumination in this regard. Specifically, the Tenth Circuit has explained that, when a State regulates the voting process, the regulation at issue is subject to either a balancing test or strict scrutiny. *Campbell v. Buckley*, 203 F.3d 738, 742 (10th Cir. 2000). The Circuit, quoting the Supreme Court, explained the "balancing test" as follows:

> 'A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights. When a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions.'

*Id*. at 743 (quoting *Burdick v. Takushi*, 504 U.S. 428, 432-434, 112 S.Ct. 2059 (1992)) (ellipses and alteration omitted). In addition, "'[r]egulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.'" *Id*. at 743-744 (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358, 117 S.Ct. 1364 (1997)). The Tenth Circuit explained that the balancing test is used in deciding the constitutionality of content-neutral regulations of the voting process. *Id*. at 745.

In contrast, the Tenth Circuit explained that "strict scrutiny is applied where the government restricts the overall quantum of speech available to the election voting process." *Id*. The Tenth Circuit pointed to certain examples of when strict scrutiny is applied; specifically, restrictions on campaign expenditures, restrictions on the available pool of circulators or other supporters of a

7

candidate or initiative, and the anonymity of political supporters. The Tenth Circuit then held that the balancing test was appropriate in *Campbell* because the law at issue might, if anything, encourage more speech. *Id*.

The Supreme Court has provided similar guidance. In *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 115 S.Ct. 1511 (1995), the Supreme Court explained that the balancing test has been used when assessing the constitutionality of "election code provisions governing the voting process itself." *Id*. at 344-345. In contrast, because the law in *McIntyre* did not control the "mechanics of the electoral process," but, instead, was a pure regulation of speech, even though it applied evenly to advocates of differing viewpoints. *Id*. at 345. As a result, the Supreme Court applied strict scrutiny. *Id*. at 347.

It is not necessarily easy, however, to differentiate laws involving the "mechanics" of the electoral process from those that regulate speech. *See Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 206-209, 119 S.Ct. 636 (1999) (Thomas, J., concurring) ("there is no bright line separating severe from lesser burdens"); *Pest Comm. v. Miller*, 626 F.3d 1097, 1105 (9th Cir. 2010) (explaining that "[t]he precise contours of what constitutes 'core political speech' are less than perfectly clear."). In *Pest Comm.*, though, the Ninth Circuit Court of Appeals provided a helpful synthesis of core political speech, explaining that "it involves 'interactive communication concerning political change.'" *Pest Comm.*, 626 F.3d at 1105 (quoting *Meyer v. Grant*, 486 U.S. 414, 422, 108 S.Ct. 1886 (1988)). The Ninth Circuit concluded that one of the laws at issue in *Pest Comm.*—a law allowing pre-election challenges to an initiative or referendum—did not involve core political speech because the pre-election challenge procedure did not involve one-on-one communication with

8

voters, even though there was evidence that the challenge procedure tied up initiative petitions for extended periods of time. *Id.* at 1109.

Further guidance can be drawn from the Supreme Court's relatively recent decision in *Reed v. Town of Gilbert, Ariz.*, 576 U.S. ___, 135 S.Ct. 2218 (2015). In *Reed*, the Supreme Court explained that content-based laws "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* at 2226. The Supreme Court then provided its explanation of what it is for a law to be content-based. A law is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed," or if the law "cannot be justified without reference to the content of the regulated speech, or [because the law was] adopted by the government because of disagreement with the message the speech conveys." *Id.* at 2227 (quotations and internal quotations omitted).

From this summary, this Court distills the following. One, if a law is content-based it is subject to strict-scrutiny analysis. Two, somewhat relatedly, if a law constitutes a regulation of speech, including core political speech, it too is subject to strict scrutiny. Three, core political speech is interactive communication about political change. Four, if a law places a severe burden on speech it is also subject to strict scrutiny. Five, one example of a severe burden is a law that reduces the overall quantum of speech available to the electorate. Six, when a law concerns the mechanics of the electoral process it is subject to a balancing test. Seven, if a law is content-neutral it too is subject to a balancing test. Eight, a law that places lesser burdens on speech is also subject to a balancing test.

Now the Court has the task of determining where the enforcement provisions fall within those guiding principles. The Court begins by summarizing the salient parts of those provisions.

The enforcement provisions are, in essence, largely the same. The parts plaintiff focuses her greatest ire towards are the following: if *any person* believes that a violation of Colorado's campaign and political finance rules (which are contained in Article XXVIII of the Colorado Constitution ("Article XXVIII")) or Colorado's Fair Campaign Practices Act (which is contained in Article 45 of the Colorado Revised Statutes ("Article 45")) has occurred, that person may file a written complaint with Colorado's Secretary of State, which the Secretary of State *must* refer to an administrative law judge within three days. The administrative law judge must then hold a hearing on the complaint within 15 days of it being referred. More specifically, plaintiff's concern is with the fact that any person may file a complaint and the fact that the Secretary of State must forward such a complaint to an administrative law judge, resulting in a hearing.

More important from the Court's perspective, however, are the laws that any person is allowed to enforce. The headings of those laws suggest their content—they involve campaign and political finance and fair campaign practices. In other words, by any construction the laws that any person is being asked to enforce involve political speech. For example, Section 9(2)(a) allows any person to file a complaint concerning violations of, *inter alia*, contribution limits to political committees, voluntary campaign spending limits, independent expenditures supporting political candidates, electioneering communications, disclosure requirements for political committees, and making reports and statements available to the public. Similarly, Section 1.5(a) allows any person to file a complaint concerning violations of, *inter alia*, disclosure requirements for political committees, rates charged for political advertising, encouraging a political candidate to withdraw his or her candidacy, and prohibitions on political subdivisions of the state from making campaign contributions.

Plaintiff's story is a living example of this. It is undisputed that plaintiff placed various advertisements in some type of periodical or newspaper critiquing "Common Core" education curricula and standardized testing programs. (ECF No. 147 at ¶¶ 5, 7.) It is also undisputed that days after placing these advertisements, a superintendent of the relevant school district filed a complaint against plaintiff because she allegedly, *inter alia*, did not register as a political committee, and thus, violated Colorado's campaign finance laws. (*Id.* at ¶¶ 12-13.) Although plaintiff's speech—the advertisements—may or may not have involved advocating for a particular candidate (*see id.* at ¶ 9), that is irrelevant to whether it involved core political speech, *see McIntyre*, 514 U.S. at 347 ("Of course core political speech need not center on a candidate for office. The principles enunciated in *Buckley* extend equally to issue-based elections such as the school tax referendum that Mrs. McIntyre sought to influence through her handbills."). Just as in *McIntyre*, plaintiff's speech here—advocating for what appears to be a controversial viewpoint[4]—is the essence of First Amendment expression. *See id.* Moreover, plaintiff's advertisements are certainly interactive communications concerning political change. *See Pest Comm.*, 626 F.3d at 1105.

As important, for purposes of the instant analysis, the enforcement provisions—as the vehicles through which Colorado's campaign finance and campaign practice laws are enforced—are undoubtedly laws that regulate this First Amendment expression. Put another way, as defendant acknowledges, without the enforcement provisions there would be no regulation of campaign finance in this State. (*See* ECF No. 147 at ¶ 16(AF).)[5] In light of the guiding principles set forth

---

[4] Although the motives of one of the people seeking to enforce Colorado's campaign finance rules against plaintiff may be open to dispute, it is undisputed that, at least in part, that person wanted plaintiff to apologize for what she said in the advertisements. (*See* ECF No. 147 at ¶¶ 22-23.)

[5] The Court uses the "(AF)" designation to indicate statements of fact drawn from defendant's additional statements of undisputed facts.

*supra*—more specifically, principle two—the enforcement provisions should be subject to strict scrutiny because they regulate core political speech. *See McIntyre*, 514 U.S. at 345-347.

There is, though, another reason why the enforcement provisions should be subject to strict scrutiny—because they are content-based. As explained *supra*, the enforcement provisions concern enforcement of campaign and political finance and campaign practice law, nothing else. Under *Reed*, this is all that is required for the enforcement provisions to be considered content-based. *See Reed*, 135 S.Ct. at 2227. In other words, the enforcement provisions apply to a particular type of speech—political speech—because of the topics discussed in said speech. It is not as if, for example, that any person could file a complaint alleging violation of Colorado's campaign finance laws if that person was challenging an advertisement advocating the purchase of a certain soda beverage. But they can seek to enforce those laws if the advertisement advocates a political issue.

That could be the end of the inquiry. But, there is another reason why, at the very least Section 9(2)(a), is content-based. Section 9(2)(a) provides that any person may file a complaint if it is believed that a violation of Colorado's campaign finance rules has been committed. Those complaints must then be referred to an administrative law judge. In the preceding provision of Section 9 of Article XXVIII, though, complaints against any candidate for the office of secretary of state must be referred to the Attorney General. Colo. Const. art. XXVIII, § 9(1)(f). Neither of the parties discuss this apparent anomaly. As far as the Court is concerned, though, it reflects a clear preference for complaints against candidates for the office of secretary of state to be referred to the Attorney General, while complaints against anyone else are referred to an administrative law judge.

In summary, the Court finds that the enforcement provisions are subject to strict scrutiny because they regulate core political speech and because they are content-based.[6]  This means that defendant must show that the enforcement provisions advance a compelling state interest and are narrowly tailored to serve that interest.  *See Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 222, 109 S.Ct. 1013 (1989).[78]

## B.    Application of Strict Scrutiny

Now that the Court has charted a course with respect to the test applicable here, application of that test is fairly straightforward.  That, however, is not simply because the Court has found strict

---

[6] As a result, in light of the guiding principles set forth *supra*, the Court need not determine whether the enforcement provisions impose a severe or lesser burden on speech to the extent regulation of core political speech is not considered a severe burden in and of itself.  *See Buckley*, 525 U.S. at 207 (Thomas, J., concurring) (stating that "[w]hen core political speech is at issue, we have ordinarily applied strict scrutiny without first determining that the State's law severely burdens speech.)

[7] The Court acknowledges that, in citing to *Eu*, it may be opening itself up to attack with respect to footnote number 6 herein.  However, the Court does not consider *Eu* as requiring much more than Justice Thomas suggested in *Buckley* was the Supreme Court's ordinary policy.  Notably, in *Eu*, although the Supreme Court stated that it first examines whether a state election law burdens First Amendment rights, the Supreme Court then concluded that such rights were burdened because the law "directly affect[ed] speech" at the core of the electoral process.  *Eu*, 489 U.S. at 222-223.  If this is not the same as Justice Thomas stating that regulations are subject to strict scrutiny when core political speech "is at issue," *see Buckley*, 525 U.S. at 207, then this Court sees very little meaningful difference between them.

[8] Having reached this conclusion, the Court pauses to note an issue—unraised by either of the parties—that has provided more than a moment of thought.  Principally, it has not been lost on the Court that the law being challenged in this case is the *enforcement* of government regulation of speech, rather than the *regulation* itself.  Moreover, plaintiff has not challenged as unconstitutional the regulations themselves.  That notwithstanding, as explained *supra*, the Court still believes that the enforcement provisions are part of the overall regulation of core political speech embodied by Colorado's campaign finance rules, and should be treated as such in terms of the First Amendment test being applied.  Nonetheless, it is also not lost on the Court the lack of applicable precedent for the issue currently before the Court—whether a provision enforcing government regulation of core political speech is unconstitutional because it impermissibly burdens such speech, even though other provisions that regulate such speech have not been challenged as unconstitutional.  Arguably, given the unique nature of that question, a test other than the ones traditionally used for analysis of First Amendment speech may be needed.  As far as this Court is concerned, though, especially in light of the parties' failure to address this issue in any way, it is not for this Court to rush unguided into the legal wilderness.  The Court will leave such trailblazing, if any, to the wisdom of any court that may review this case on appeal.  So it is clear, though, as instructed by the Tenth Circuit in *Doe*, this Court has considered what First Amendment test is applicable to the facts of this case in light of existing precedent, and come to its conclusion.

scrutiny to be the applicable test. *See Eu*, 489 U.S. at 233-234 (Stevens, J., concurring) ("'I have never been able fully to appreciate just what a 'compelling state interest' is. If it means 'convincingly controlling,' or 'incapable of being overcome' upon any balancing process, then, of course, the test merely announces an inevitable result, and the test is no test at all.'") (quoting *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 188, 99 S.Ct. 983 (1979)) (Blackmun, J., concurring).

No, the real reason that application of the strict scrutiny test, or any actual test for that matter, is relatively straightforward is because defendant, in its response, chose to place all of its eggs in a test that, as explained, is not an actual test. Almost the entirety of defendant's argument in response is dedicated to explaining why *plaintiff* has failed to overcome the "in every application" principle. At no point does defendant even attempt to explain how the enforcement provisions may satisfy any actual test for determining their constitutionality. This is doubly confusing because the party in the same position as defendant in *Doe* made the precise same mistake, and the Tenth Circuit plainly stated how "perplexed" it was with such a strategy. *See Doe*, 667 F.3d at 1136. This Court is no less perplexed.

Nonetheless, the Court must still apply the strict scrutiny test. First, defendant must show that the enforcement provisions advance a compelling state interest. Defendant has not done so because defendant has made no attempt to explain what state interest, compelling or otherwise, is advanced by the enforcement provisions. (*See generally* ECF No. 145.)[9] Defendant has also not

---

[9] Even a word search for the words "interest" or "interests" only turns up two instances of those words being used in the response (*see* ECF No. 145 at 5, 16), neither of which relate to the enforcement provisions advancing Colorado's interests.

provided any evidence of its interest being advanced by the enforcement provisions. (*See generally* ECF No. 147.)

To the extent the Court wants to go out on a limb for defendant, arguably, it seems like defendant believes that the enforcement provisions advance the state's interest in enforcing Colorado's campaign finance laws because defendant is not authorized, funded, or equipped to enforce those laws itself. (*See* ECF No. 145 at 18.) Although enforcement of Colorado's campaign finance laws could be considered a compelling state interest, the fact that the law being challenged does not authorize defendant to enforce the same hardly seems like a ringing endorsement of the persons—i.e., everyone else—who have been deemed worthy to act as enforcers. Otherwise, a challenged law could set the terms for its own constitutionality. Put another way, allowing any person to enforce the enforcement provisions is the problem, not a source of justification. That being said, although defendant presents no evidence that having any person enforce Colorado's campaign finance laws actually advances Colorado's interest in enforcing those laws, for arguments sake, the Court will assume that this interest is so advanced.

This then turns to the second matter that defendant must show—that the enforcement provisions are narrowly tailored to advance Colorado's interest in enforcing its campaign finance laws. Yet again, defendant makes no attempt to explain how this is so in its response. (*See generally* ECF No. 145.) And, again, defendant provides no evidence that the enforcement provisions are narrowly tailored. (*See generally* ECF No. 147.) This is perhaps not surprising given that defendant concedes there is no evidence that its interests could not be served equally well by a system different to the one contained in the enforcement provisions.[10]

---

[10] One such different system, of course, could be defendant itself, or, like in Section 9(1)(f) of Article XXVIII, the Attorney General. The Attorney General would seem to be a natural fit for the job. *See*

Thus, even if the Court were willing to make an argument for defendant in defense of the enforcement provisions, the Court cannot create something out of nothing. As a result, ultimately, because defendant has failed to explain or provide evidence of how the enforcement provisions satisfy strict scrutiny, plaintiff is entitled to summary judgment. *See Doe*, 667 F.3d at 1131-35.

## C.    Application of the Balancing Test

For the sake of completeness, and in the event that this Opinion and Order should find itself being reviewed on appeal, the Court applies the balancing test to the enforcement provisions as well. As mentioned *supra*, the balancing test is as follows:

> 'A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights. When a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions.'

*Campbell*, 203 F.3d at 743 (quoting *Burdick*, 504 U.S. at 432-434) (ellipses and alteration omitted).

Here, the character of the asserted injury is a diminution of First Amendment speech. For example, it is undisputed that, due to the enforcement provisions, plaintiff no longer speaks out about

---

Colo. Rev. Stat. § 24-31-101(1)(b) (providing that, when requested by the Secretary of State, it is the Attorney General's duty to prosecute and defend all suits relating to matters connected with the department of state); Colo. Const. art. XXVIII § 9(1)(a) (providing that the Secretary of State must prepare forms and instructions to assist the public in complying with reporting requirements, and promulgate rules needed to administer and enforce Article XXVIII). In that way, whether or not the department of state is funded or equipped to prosecute campaign finance complaints would be of little relevance. In any event, funding and manpower are weak excuses for allowing any person to enforce the laws of the State. *See Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 747, 131 S.Ct. 2806 (2011) (concluding that a law, which may have helped a state "fine-tun[e]" its campaign financing system to avoid a drain on public resources, was of "no moment" because "the First Amendment does not permit the State to sacrifice speech for efficiency.") (quotation omitted).

issues that matter to her. (ECF No. 147 at ¶ 27.) As for the magnitude of that injury, i.e., the amount of speech that has been diminished as a result of the enforcement provisions, plaintiff has provided little evidence, at least in her pleadings and statements of undisputed facts. The magnitude of injury is briefly alluded to in plaintiff's reply statement of undisputed facts, however. Therein, plaintiff asserts that 10 out of 34 persons questioned in a survey by plaintiff's expert stated that their ability to participate in the activity that led to a campaign finance complaint was to some extent limited. (ECF No. 154-1 at ¶ 18(AF).)[11] Although "limited" does not mean "stopped," speech does not have to be completely suppressed before an injury has been caused. *See Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642, 114 S.Ct. 2445 (1994) ("Our precedents thus apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content."). Limiting speech is certainly a disadvantage wrought upon the same. Therefore, although the evidence plaintiff has presented is not overwhelming by any stretch of the imagination, there is at least some evidence of the character and magnitude of the asserted injury.

That is more than can be said for evidence of the precise interest(s) defendant has put forward as justification for the burden imposed by the enforcement provisions. As explained *supra*, defendant has not put forward any precise interest justifying the enforcement provisions, and thus, there is no evidence in that regard either. That, again, should end the inquiry. But, if the Court was

---

[11] Plaintiff also makes two other assertions in reply to additional factual statement 18. First, 24 out of 34 survey participants said their willingness to get involved in political activities had been negatively impacted. (ECF No. 154-1 at 18(AF).) What "negative impact" means in this context is unclear. It would have been far more helpful if the survey participants had been asked if they had stopped speaking due to the enforcement provisions. Second, 28 out of 34 survey participants believed that responding to a campaign finance complaint would negatively impact ordinary people in speaking out on public issues. What this has to do with the magnitude of injury is very unclear. Merely because the survey participants are being asked to speculate about what other peoples' reactions would be to a campaign finance complaint does not make that speculation evidence of anything, other than the participants' beliefs. As such, the Court does not find either of these proposed pieces of evidence to be helpful in determining the magnitude of injury.

willing to walk the plank for defendant again, arguably, the only precise interest that may exist on the record is the interest in enforcing Colorado's campaign finance rules. Assuming arguendo that such an interest exists, the next question would be whether that interest makes it necessary to burden plaintiff's rights. If the restriction is reasonable and non-discriminatory, then the enforcement provisions may survive the balancing test.

The enforcement provisions, however, are not reasonable.[12] First, defendant has made no argument that they are reasonable. So, again, the Court is painting on an empty canvas. Nonetheless, the Court sees nothing reasonable about outsourcing the enforcement of laws with teeth of monetary penalties to anyone who believes that those laws have been violated. What does "believes" mean and how is that a reasonable method to protect the State's interest in enforcing its campaign finance laws? Moreover, how is it reasonable to encroach upon First Amendment speech by allowing a person to enforce campaign finance regulations when that person may have no experience of campaign finance regulations? Because that is precisely what the enforcement provisions facially allow—any person to enforce them, which obviously includes those people with no experience of campaign finance regulations. (*See* ECF No. 147 at ¶ 74.) The enforcement provisions, obviously, also facially allow for someone with an abundance of campaign-finance-regulation experience to enforce the same. But, why it is reasonable for the enforcement provisions

___

[12] The Court, thus, need not decide whether the enforcement provisions are non-discriminatory. The parties spend much time, perhaps too much time, discussing the potential (or lack thereof) for the enforcement provisions to allow persons to discriminate against speakers on the basis of the content of their speech. Some of the evidence presented by plaintiff in this regard is, for sure, troubling, at least from a discrimination standpoint. The conduct of one particular actor/group is of notable concern. Presumably, when the voters of Colorado approved Article XXVIII they did not want enforcement of campaign finance violations to become a feeding ground for political warfare and what could be described as extortion. (*See* ECF No. 147 at ¶¶ 2, 50.) That being said, whether or not viewpoint discrimination is the sole or partial motivation for some or many campaign finance complaints in this State is *irrelevant* to the Court's analysis herein, and has played no part in the same.

to leave the enforcer to chance is beyond the Court, and is certainly not reasonable, especially when considered in light of the asserted injury—a diminution of First Amendment speech.

As a result, the Court finds that the enforcement provisions do not satisfy the balancing test, and thus, plaintiff is entitled to summary judgment on that ground as well.

### D. Other Arguments Defendant Raises

Apart from asserting that this Court should apply an "in every application" test, defendant also raises various other arguments in its response that the Court will now address. First, defendant argues that plaintiff does not qualify for relief under 42 U.S.C. § 1983 because defendant, i.e., the Secretary of State, has not deprived plaintiff of any constitutional rights. (ECF No. 145 at 7-10.) The Court disagrees. Even a case defendant cites undermines its argument. Defendant argues that, in order to establish state action, plaintiff's deprivation must be caused by a right or privilege created by the State or a rule imposed by the State. (*Id*. at 8.) As far as the Court is concerned, that is precisely what the enforcement provisions do—create a right in any person to enforce the State's campaign finance rules. It is not as if any person could start seeking to enforce other parts of the State's regulatory framework just because they believe a regulation has been violated. No, instead, it is the express grant in Section 9(2)(a) that divests defendant from enforcing the State's campaign finance rules and places that right in any person. How that is not a right created by the State or a rule of the State, the Court does not know.

Second, defendant argues that the enforcement provisions are not unique when compared to other states' laws. As a principle matter, the Court does not understand why, whether or not Colorado has the same, similar, moderately different, or a radical way of enforcing its campaign

finance rules is relevant to anything the Court has discussed herein. It is not. If a law fails to satisfy the strict scrutiny test or the balancing test—neither of which ask this Court to look to other states and assess the similarity of their laws to the one being challenged—then the law is unconstitutional. It is that simple. Merely because, in defendant's view, other laws may be similarly unconstitutional or constitutional is of no concern as to the constitutionality of the laws before this Court.

Defendant, though, takes a very different view, apparently content to spend much of its response informing the Court about the wonder (or lack thereof) of other systems similar (or not so) to the one in Colorado. The Court disagrees with defendant that Illinois' system is similar. According to defendant, there is a specific provision in Illinois' law that allows for the screening of complaints to determine whether they are justified. (ECF No. 145 at 13.) For some reason, defendant believes this is similar to Colorado's system. How that is so, the Court does not know. Notably, defendant does not cite to any part of Colorado's law that mirrors or is similar to the screening procedure in Illinois. (*See id*. at 13-14.)

The Court further disagrees that Florida's system is some form of proof that screening does not work. Defendant asserts that Florida delegates enforcement authority for campaign finance violations to an independent commission, and 98% of the complaints the commission receives are politically motivated. (*Id*. at 11.) The only question the Court can provide to that is, and? It is immaterial what percentage of complaints are politically motivated that the commission *receives*. The whole point of the commission is to weed out the politically motivated complaints it receives.

The Court also disagrees that *Fritz v. Gordon*, 517 P.2d 911 (Wash. 1974), is relevant here. The court in that decision did not make any First Amendment analysis of the law in question. Instead, the court predominately focused upon the fact that the law in question was similar to qui tam

laws in general. *See id*. at 312-313. Given the First Amendment ramifications in this case, the Court does not see how qui tam laws in general are relevant. Put another way, merely because private citizens can bring other types of law suits does not absolve defendant of putting forth some evidence and argument that strict scrutiny or the balancing test have been satisfied. The same is true of the idea that awarding speakers attorney fees for the bringing of frivolous complaints against them somehow obviates the content-based nature of the enforcement provisions and their regulation of core political speech. As far as the Court is aware, and defendant has made no attempt to argue otherwise, a law does not magically become content-neutral or no longer a regulation of speech merely because there is an opportunity—and it is only an opportunity—that the person whose speech-rights have been infringed can obtain some after-the-fact compensation for the cost of defending those rights. The fact that awarding attorney fees may act as some kind of deterrent to enforcers of Colorado's campaign finance rules is, therefore, irrelevant to the First Amendment strict scrutiny analysis that the Court must follow.[13]

Third, defendant argues that, in order for plaintiff's facial challenge to be successful, she must show how the enforcement provisions compare negatively to other systems. (ECF No. 145 at 19.) Why this is so is entirely unclear. It is certainly not rooted in any citation to precedent. (*See*

---

[13] The Court also does not find *King Street Patriots v. Tex. Democratic Party*, 521 S.W.3d 729 (Tex. 2017), to be helpful, not least because the Texas Supreme Court does not appear to have been asked to consider whether the laws being challenged infringed First Amendment speech rights, or subjected those laws to any level of scrutiny other than to conclude they were not overbroad. *See id*. at 739-742. Moreover, the laws are simply different to the ones here. In *King Street*, the court pointed to numerous procedural safeguards provided by the laws. *Id*. at 739-740. Here, defendant points to only one safeguard—the potential award of attorney fees for frivolous complaints. (ECF No. 145 at 17.) The court in *King Street* also explained that, "[t]o successfully mount a claim under the Election Code, a potential plaintiff would have to prove it was a political committee with an 'opposing interest in the election in connection with which the contribution was made.'" *King Street*, 521 S.W.3d at 741 (alteration omitted). Here, no such showing is required for a person or group to become a plaintiff, as any person can be one. If anything, the Texas Election Code would appear to more narrowly tailor the enforcement of a campaign violation, given that it ensures that a complainant has an opposing interest and is either a political committee or a candidate.

*id*.)  Instead, it appears to be based upon defendant's assumption that, because there must be a constitutional way to enforce campaign finance laws, plaintiff must show that the enforcement provisions have some type of negative aspect to them in comparison to a constitutional system.  (*See id*.)  Defendant even goes as far to suggest that, even if the enforcement provisions "significantly chill[] political speech," there must be some "systematic negative effect[]" that is "particular" to the enforcement provisions.  (*Id*.)[14]  This is, again, unrooted in any precedent.  To the extent it is rooted in anything, it appears to still be tied to defendant's belief that the "in every application" principle is a workable test for facial challenges to speech regulations.  As explained, that is not so.  As such, defendant's assertion that plaintiff has left unanswered a "critical" question—whether the enforcement provisions produce more politically-motivated complaints (ECF No. 145 at 20)—is simply wrong.  That question is not critical, or even relevant.[15]

Fourth, defendant argues that plaintiff has failed to show that her alleged harm has been caused by the enforcement provisions.  (ECF No. 145 at 23, 27.)  However, such an argument ignores that it is the regulation of political speech or the existence of content-based laws that is the harm relevant to the Court's analysis.  *See Reed*, 135 S.Ct. at 2226; *McIntyre*, 514 U.S. at 347; *Turner Broad.*, 512 U.S. at 642; *Eu*, 489 U.S. at 222-223.

Fifth, defendant argues that a change in 2017 to Colorado's enforcement of its campaign finance laws reduces the likelihood that large penalties will be imposed for minor violations of the

---

[14] Why "significantly chill[ing] political speech" would not be a "systematic negative effect[]" of the enforcement provisions is unclear.

[15] Similarly, although the parties spend a significant amount of time arguing over the motivation of persons that file campaign finance complaints (*see, e.g.*, ECF No. 145 at 20-27), as noted *supra*, the Court does not find those arguments or evidence with respect to the same relevant.  Put simply, the motivation of the enforcer, whatever that motivation may be, does not change whether the enforcement provisions are content-based or a regulation of core political speech.

law.  (ECF No. 145 at 28-31.)  This, of course, does not address the content-based or speech-regulatory nature of the enforcement provisions.  Thus, the Court does not find the 2017 change to the law to be relevant.  Even if the Court were to find the 2017 change relevant, there are still many questions surrounding it.  The 2017 change appears to only apply to "committees."  *See* Colo. Rev. Stat. § 1-45-109(4)(c).  As for those individuals who are not required to register as a committee, the 2017 change presumably provides little solace.  In addition, although defendant acknowledges that plaintiff raised concerns with the 2017 change (ECF No. 145 at 30), defendant appears to ignore those concerns in response (*see id*.).

### E.      Remedy

Plaintiff requests that the enforcement provisions be declared facially unconstitutional.  (ECF No. 1 at 18.)  In light of the Court's findings *supra*, notably, that plaintiff is entitled to summary judgment as to the facial unconstitutionality of the enforcement provisions, the Court finds that plaintiff is entitled to that relief.

Plaintiff also seeks a permanent injunction barring defendant from administering the enforcement provisions.  (*Id*.)  Defendant, briefly, opposes this request, asking, in the event plaintiff is granted summary judgment, for a stay of any such ruling pending appeal, or, alternatively, until the Colorado General Assembly can address the enforcement provisions in early 2019.[16]  Plaintiff opposes this request, arguing that there is no basis for a "freestanding" stay, and defendant has failed to carry its burden to justify a stay pending appeal.  (ECF No. 154 at 20-21.)

Defendant, perhaps unsurprisingly, but at least consistently, provides no precedent to support its request.  All defendant cites, without pinpoint citation, is a Supreme Court case, *Purcell v.*

---

[16] Apparently, the General Assembly closed for business on May 9, 2018.  (*See* ECF No. 145 at 3 n.2.)

*Gonzalez*, 549 U.S. 1, 127 S.Ct. 5 (2006), for the proposition that court-ordered alterations to election procedures are discouraged immediately prior to an election. (ECF No. 145 at 3.) Colorado's campaign finance laws, including the enforcement provisions, though, are not election procedures or otherwise like the voter identification laws at issue in *Purcell*. *See Purcell*, 549 U.S. at 2. In addition, what does defendant mean by "immediately prior to [an] election"? In *Purcell*, it was a month before the election when an injunction was ordered. *Id*. at 3. Here, it is nearly five months before the 2018 elections. The Court acknowledges that *electioneering*, such as advertisements, may have already begun for the 2018 elections, but this is precisely why the laws at issue here are very different to the ones in *Purcell*. As a result, the Court does not find that, should a permanent injunction be granted, defendant would be entitled to a freestanding stay pending the General Assembly's return to work.

That being said, the Court must still determine whether plaintiff is entitled to a permanent injunction. "A party requesting a permanent injunction bears the burden of showing: (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Crandall v. City & Cnty. of Denver*, 594 F.3d 1231, 1235-36 (10th Cir. 2010) (quotation omitted).

In light of the Court's findings herein, the first part of that test has been satisfied—plaintiff has achieved actual success on the merits. With respect to the remaining factors, though, plaintiff does not address any of them in either the motion for summary judgment or her reply. (*See generally* ECF Nos. 131, 154.) Although the Court acknowledges that it has performed some argumentative tasks on behalf of defendant herein, the Court cannot simply create plaintiff's arguments for her in

establishing at least the second and third factors. Therefore, at this point, the Court cannot grant plaintiff a permanent injunction.

Instead, the Court sets the following schedule:

(1)     On or before June 19, 2018, plaintiff may file a five-page motion for permanent injunction, addressing the remaining factors outlined above. On the same day, defendant may file a five-page motion for a stay pending appeal, addressing the factors set forth in *Nken v. Holder*, 556 U.S. 418, 433-434, 129 S.Ct. 1749 (2009), and those factors only.[17]

(2)     Within five (5) days of the filing of plaintiff's motion for permanent injunction, if any, defendant may file a five-page response. Equally, within five (5) days of the filing of defendant's motion for a stay pending appeal, plaintiff may file a five-page response.

(3)     No replies will be allowed.

The parties should bear the following in mind when making their arguments, if any. Five pages is the maximum that the Court will allow for any pleading. No extension to the filing deadlines will be allowed. Should plaintiff fail to file a motion for permanent injunction within the deadline set forth above, the Court will enter an order denying any such relief. The parties should make their arguments in light of the Court's findings herein. In other words, the parties should not attempt to challenge any of the findings herein or make any new arguments or present any new evidence regarding the same; the time for that has come and passed. The parties should rely on the

---

[17] Although, as plaintiff observes, defendant has failed to explain why it is entitled to a stay pending appeal (*see* ECF No. 154 at 20), much the same could be said of plaintiff with respect to her request for a preliminary injunction. As such, the Court gives both parties another opportunity on these matters.

evidence submitted in connection with the motion for summary judgment. This is not an opportunity for new evidence to be presented. With respect to plaintiff's motion for preliminary injunction, the Court simply wants to know (1) what, if any, irreparable harm will occur without a permanent injunction, (2) whether the threatened injury will outweigh any harm to defendant, and (3) whether a permanent injunction will adversely affect the public interest.[18] No judgment will be entered until the Court has decided whether plaintiff is entitled to a permanent injunction.

## III.    Conclusion

For the reasons set forth herein, the Court:

(1)    GRANTS plaintiff's motion for summary judgment (ECF No. 129, 131) to the extent that the Court finds Article XXVIII, § 9(2)(a) of the Colorado Constitution and Colo. Rev. Stat. § 1-45-111.5(1.5)(a) to be facially unconstitutional under the First and Fourteenth Amendments of the U.S. Constitution; and

(2)    Plaintiff's request for a permanent injunction and defendant's request for a stay pending appeal will be resolved as set forth herein.


**SO ORDERED.**

DATED this 12th day of June, 2018.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge

---

[18] So the parties marshal their efforts appropriately, the Court suggests that this last factor—the public interest—will most likely fall in favor of plaintiff, given that the Court has found that her constitutional rights have been violated. *See Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (explaining that "the public has a more profound and long-term interest in upholding an individual's constitutional rights.") (quotation omitted).